In the

# United States Court of Appeals

## For the Seventh Circuit

No. 03-4342

JERRY WARD,

*Petitioner-Appellant,*

*v.*

CHARLES L. HINSLEY,

*Respondent-Appellee.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 99 C 7527—**Robert W. Gettleman**, *Judge.*

ARGUED MAY 18, 2004—DECIDED JULY 28, 2004

Before FLAUM, *Chief Judge*, and KANNE and ROVNER,
*Circuit Judges*.

FLAUM, *Chief Judge.* Petitioner-appellant Jerry Ward
appeals from a judgment of the United States District Court
for the Northern District of Illinois denying his petition for a
writ of habeas corpus brought under 28 U.S.C. § 2254. His
appeal presents the question of whether a federal habeas
court may review procedurally defaulted claims of alleged
structural errors when the petitioner has not argued that
the procedural default is excused by cause and prejudice or
that a fundamental miscarriage of justice will result if the

claims are not addressed. We hold that a federal habeas court may not review such claims, and therefore we affirm the district court's denial of Ward's petition for a writ of habeas corpus.

## I.  Background

Ward has not rebutted the state court's factual determinations. Therefore, we presume the state court's recitation of the facts to be correct. 28 U.S.C. § 2254(e)(1), *Mahaffey v. Schomig*, 294 F.3d 907, 915 (7th Cir. 2002).

Ward was indicted by a grand jury for the shooting murder of Bruce Herd, the bludgeoning murder of Pamela Williams, the armed robbery of Bruce Herd, and possession of a stolen motor vehicle.

At Ward's jury trial, police officers Joseph Scardino, James Peck, and James Summerville testified that they responded to a call of a man being dumped from a car on February 15, 1986. At approximately 9:35 p.m., they found a black male lying in the snow with a gunshot wound to the skull. The body was later identified as Bruce Herd.

Officer Scardino and his partner left the scene to drive around the area. They were alerted to the description of the suspect vehicle. Shortly thereafter, they found a car that matched the description and ultimately arrested Ward, the driver of the car. From the front seat of the car, the officers recovered a .38-caliber revolver and two spent cartridges. Officer Scardino testified that he saw a "red substance in the form of dots" as well as a "white fleshy material or matter" on the car and on Ward's face and clothes.

After Ward had been handcuffed, Officers Peck and Summerville joined Officer Scardino. Officers Peck and Summerville testified that they saw a red substance and a "white flesh" substance on Ward's face and on the front of his clothing. They saw the same red and white materials on

the trunk and right rear quarter panel of the car. Ward was arrested and transported to the police station. At the station, additional detectives noted that red splatters appeared on Ward's outer jacket, trousers, shoes, and undershorts.

Shortly after Ward's arrest, officers received an additional notification about a man shot. Officers ultimately found the second victim, Pamela Williams, lying in the snow. An officer testified that a tire jack and hat were lying in the snow near the body.

An evidence technician collected the physical evidence from the case, including plastic cups and soda cans recovered from the car that Ward had been driving, and numerous fingerprints, and blood samples found at the crime scenes. The technician also took many photographs of the crime scenes. A serologist for the crime lab, Pamela Fish, analyzed the samples taken from Ward's clothing, the tire jack, the garage door, car trunk lid, and car right fender. She testified that the bloodstains were consistent with Williams' blood and inconsistent with Ward's and Herd's blood. From the shot residue analysis and swabs taken from Ward's hands, a crime lab chemist concluded that the evidence was consistent with Ward having recently discharged a handgun.

The State also presented the report of a firearm expert. That expert had concluded that the bullet that had killed Herd had been fired from a .38-caliber revolver like the one recovered from the car Ward had been driving. A latent print examiner conducted an exam of the fingerprints taken from the exterior of the car and from the items recovered from the car, finding that a print from the exterior passenger window and a print from one of the plastic cups recovered from the car were made by Ward. Williams matched a print from the soda can found in the car, and Herd matched a print from a plastic cup. No prints were recovered from the gun or tire iron.

A medical examiner performed the autopsies on the victims, concluding that Herd was killed by a gunshot wound to the back of the head, and that Williams died from injuries due to beating. The examiner discovered forty-six external injuries and eleven internal injuries to Williams and noted that the beating would have caused the emission of brain matter.

Other testimony at trial included that of Curtis Rollins, who testified that while he was in his home at 9:20 p.m., he heard two gunshots. He looked out the window but could not see anything because a garage blocked his view. At 11 p.m. he went to the store and on his return he saw a body laying in front of a garage in the alley.

After the State rested, defense counsel called Detective Warren Gavin. Gavin testified that during his February 17, 1986 interview of Rollins, Rollins had not stated that he had heard two shots fired at 9:20 p.m. on February 15. Defense counsel attempted to introduce a statement that Ward had made to the police about how he had acquired the car, but the judge ruled the statement inadmissible.

On the next day of trial, defense counsel requested a continuance for the purpose of locating five additional witnesses. The defense proferred that three of the witnesses would testify to Ward's alibi; a fourth would testify to his recollection of seeing two black men, neither of whom was Ward, remove a body from the car and drive away; the fifth would testify that he saw two black men remove a body from a car and drive away. The court granted a lunch recess to locate the witnesses, but the defense was able to locate only one witness during the allotted time. Ward decided not to call that witness, and he rested his case.

The jury returned guilty verdicts on the charges of murder, armed robbery, and possession of a stolen motor vehicle. Ward waived his right to sentencing by the jury. The trial judge sentenced him to death for each of the murders,

in addition to a thirty-year term of imprisonment for the armed robbery conviction and a three-year term of imprisonment for the possession of a motor vehicle conviction, the sentences to run concurrently.

The Illinois Supreme Court affirmed Ward's appeal of his convictions and sentences on direct appeal. *People v. Ward*, 154 Ill.2d 272 (Ill. 1992). The Illinois Supreme Court later affirmed the dismissal of Ward's post-conviction petition. *People v. Ward*, 187 Ill.2d 249 (Ill. 1999).

Ward filed a petition for a writ of habeas corpus in the district court pursuant to 28 U.S.C. § 2254. While the petition was pending, former Illinois Governor George Ryan commuted Ward's sentence to natural life in prison without possibility of parole. Ward then filed a second amended petition for a writ of habeas corpus in the district court. The district court denied all of the claims in the petition. Regarding the claims that Ward advances in this appeal, the district court found that they were procedurally defaulted in the state courts. Because Ward did not attempt to overcome the procedural default by arguing cause for noncompliance with the state procedural rule and actual prejudice arising from the alleged constitutional violations, or that a fundamental miscarriage of justice would occur if the district court did not address the merits of the claims, the district court concluded that the claims were not subject to review in a § 2254 petition. *United States ex rel. Ward v. McAdory*, No. 99 C 7527, 2003 WL 22872121 (N.D. Ill. Dec. 3, 2003) (order dismissing habeas corpus petition). The district court granted a certificate of appealability on the sole issue of whether *Edwards v. Carpenter*, 529 U.S. 446 (2000) requires a petitioner to establish cause and prejudice with respect to procedurally defaulted claims of alleged ex parte communications, perjured testimony, and *Brady* violations, in order to obtain review in the habeas court.

## II. Discussion

We review the district court's findings of law de novo. *Walton v. Briley*, 361 F.3d 431, 432 (7th Cir. 2004).

In his petition for a writ of habeas corpus, Ward claimed that his custody was in violation of the Constitution of the United States because his trial judge had engaged in two ex parte communications, the State had knowingly presented perjured testimony, and the State had failed to tender an exculpatory photograph of Ward taken shortly after his arrest. Ward argued that the combined effect of these three errors constituted "a structural defect in the constitution of the trial mechanism" mandating automatic reversal. *See Arizona v. Fulimante*, 499 U.S. 279, 309 (1991). Ward conceded before the district court that he had not raised any of these arguments before the Illinois courts and that they are therefore procedurally defaulted. Rather than argue that the procedural default was excusable due to cause and prejudice, or that the failure to review the federal claim would result in a fundamental miscarriage of justice, *see Edwards v. Carpenter*, 529 U.S. 446, 451 (2000), Ward argued that he need not satisfy those requirements due to the structural nature of his claims. In Ward's view, his claims invoke constitutional protections so basic that they are reviewable by the federal habeas court, regardless of his procedural default of those claims in the Illinois courts.

Of the three trial errors that Ward contends cumulated to form a structural error in the mechanism of his trial, the first is in regards to the decisions of his trial judge to engage in two ex parte conversations. The first ex parte conversation occurred during voir dire, when the prosecution wished to exclude a potential juror because of her views on the death penalty, and the defense wished to exclude a different potential juror because he had stated that business matters might distract him during the trial. The trial judge examined the two prospective jurors outside of the

presence of both counsel to determine whether these jurors should be dismissed for cause or by way of peremptory challenge.

A second ex parte conversation occurred on the fifth day of trial, shortly after the defense requested a continuance for the purpose of locating witnesses to support Ward's alibi. In order to evaluate the request, the trial judge examined the statements that the proffered defense witnesses had made to the police during the investigation of the crime. In chambers, outside of the presence of counsel, the trial judge consulted with the police investigator who had taken down the statements. Ultimately, the trial judge concluded that the prospective witnesses would not provide relevant testimony and allowed only the ninety-minute lunch break for the defense to find the witnesses. Ward contends that the multiple ex parte conversations deprived him of the right to be personally present and to be represented by counsel at all critical stages of the proceedings. *See United States v. Wade*, 388 U.S. 218, 224-25 (1987).

Next, Ward alleges that his conviction is based on the perjured testimony of Officer Summerville, crime lab serologist Pamela Fish, and witness Curtis Rollins. Ward claims that Officer Summerville lied under oath when he stated that he saw white fleshy material on Ward and Ward's car, and he presents three arguments in support of this assertion. First, Ward notes that no photographs of the alleged white fleshy matter were taken by the evidence technician. Secondly, Ward mentions that Summerville's testimony has been discredited repeatedly by the Illinois courts in various unrelated cases. Lastly, Ward refers to the judgment entered against Summerville in state court, convicting him for abusing his official capacity. Regarding Pamela Fish's testimony, Ward cites to inconsistencies in her official records to indicate the possibility of perjury. Lastly, Ward submitted an affidavit signed by Rollins attesting to the fact that he perjured himself at trial when he testified that he saw Williams' body in the alley.

Finally, Ward argues that the State failed to tender a photograph that detectives took of him shortly after his arrest. He believes that this photo would indicate that he did not have any "white fleshy material" or "brain matter" on his person at the time that he was arrested. Because he believes that the photograph would have aided his defense, he argues that the State was bound by *Brady v. Maryland*, 373 U.S. 83 (1963) to furnish him with a copy of it. Under *Brady*, "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87.

On appeal, Ward concedes that he procedurally defaulted the claims arising from the ex parte conversations and the State's alleged knowing presentation of perjured testimony. However, notwithstanding Ward's failure to present the *Brady* claim to the Illinois courts, Ward argues that the claim is not procedurally defaulted because his counsel was unaware of the existence of the photograph during Ward's proceedings in state court. *See Crivens v. Roth*, 172 F.3d 991, 995-96 (7th Cir. 1999) (stating that procedural default of *Brady* claim is excusable when the petitioner was unable to present the claim to the state courts "because of the state's misconduct"). The State counters that, during the pendency of Ward's case in state court, Ward's counsel had access to the Chicago police department's progress reports from the murder investigation. Those reports indicated the existence of the photograph to which Ward refers, yet Ward's counsel did not request the photograph at that time. Ward has not rebutted the State's allegations regarding the availability and completeness of the progress reports, nor has he otherwise persuaded us that the State suppressed the existence of the photograph, or the photograph itself. We therefore conclude that Ward's *Crivens* argument is unavailing. Like Ward's claims arising from the ex parte conversations and

allegedly perjured testimony, Ward's *Brady* claim was procedurally defaulted in state court.

Citing *Coleman v. Thompson*, 501 U.S. 722, 730 (1991), the Supreme Court reiterated in *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000) that a prisoner must "demonstrate cause for his state-court default of *any* federal claim, and prejudice therefrom, before the federal habeas court will consider the merits of that claim." (Emphasis in original). *Edwards* recognized only one exception to the cause and prejudice rule: only in "the circumstance in which the habeas petitioner can demonstrate a sufficient probability that our failure to review his federal claim will result in a fundamental miscarriage of justice" may a federal habeas court review a procedurally defaulted claim that has not been excused by a demonstration of cause and prejudice. *Edwards*, 529 U.S. at 451, citing *Coleman*, 501 U.S. at 732. The Supreme Court has described the "class of cases . . . implicating a fundamental miscarriage of justice" as the "extraordinary instances when a constitutional violation probably has caused the conviction of one innocent of the crime." *McCleskey v. Zant* , 499 U.S. 467, 494 (1991). In *Coleman,* the Supreme Court did not excuse claims of structural error from compliance with the procedural default doctrine. *See Coleman*, 501 U.S. at 750; *Hatcher v. Hopkins*, 256 F.3d 761, 764 (8th Cir. 2001).

Despite *Edwards*, Ward argues that he need not excuse the procedural default of his claims arising from the ex parte conversations, the allegedly perjured testimony, and the alleged *Brady* violation because the cumulative effect of the errors calls into question the reliability of the entire trial. Ward maintains that the collective errors constitute a structural error. Structural defects implicate the fairness and reliability of the entire trial process and require automatic reversal. *See Neder v. United States*, 527 U.S. 1, 8-9 (1999); *Arizona v. Fulimante*, 499 U.S. 297, 309 (1991). Errors of this magnitude include "the complete denial of counsel, a biased judge, racial discrimination in the selection of the

grand jury, the denial of self-representation, the denial of a public trial, and a defective reasonable doubt instruction." *United States v. Harbin*, 250 F.3d 532, 543 (7th Cir. 2001) (*citing, respectively, Gideon v. Wainwright*, 372 U.S. 335 (1963); *Tumey v. Ohio*, 273 U.S. 510 (1927); *Vasquez v. Hillery*, 474 U.S. 254 (1986); *McKaskle v. Wiggins*, 465 U.S. 168 (1984); *Waller v. Georgia*, 467 U.S. 39, (1984); and *Sullivan v. Louisiana*, 508 U.S. 275 (1993)). In Ward's view, the right to a structurally sound trial is one that is not subject to waiver and therefore cannot be subject to procedural default. Ward argues that *Edwards* did not intend to remove procedurally defaulted claims of structural error from review by the federal habeas court.

We do not accept Ward's suggestion that a federal habeas court may review a prisoner's federal constitutional claims, notwithstanding the prisoner's failure to raise the claims before the state court, so long as the claimed right rises to the magnitude of a structural error. Contrary to Ward's assumption, the procedural default doctrine does not seek to distinguish claims of trial error from claims of structural error. Rather, the doctrine serves to distinguish claims that were raised before the state courts from claims that the state courts had no opportunity to consider. The procedural default doctrine is "grounded in concerns of comity and federalism." *Coleman*, 501 U.S. at 730. These concerns are in no way diminished if the federal claim raised before the federal habeas court is one of structural error. Under existing Supreme Court jurisprudence, concerns of comity and federalism are set aside at habeas review only when the procedural default is excusable due to cause and prejudice, or when a petitioner has claimed a miscarriage of justice by establishing that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Schlup v. Delo*, 513 U.S. 298, 322 (1995) quoting *Murray v. Carrier*, 477 U.S. 478, 496 (1986).

State courts have "initial responsibility for vindicating constitutional rights" in state criminal trials. *Engle v. Isaac*, 456 U.S. 107, 128 (1982). Review by the federal habeas court of constitutional claims that were not brought before the state court detracts from the significance of the trial and from the role of the state courts in enforcing federal rights. If prisoners were permitted to bring claims of structural error to the federal habeas court in the first instance, then criminal defendants would have little incentive to make a claim of right during state court proceedings. Defense lawyers would be prone to "sandbagging," that is, to "tak-[ing] their chances on a verdict of not guilty in a state trial court with the intent to raise their constitutional claims in a federal habeas court if their initial gamble [did] . . . not pay off." *Wainwright v. Sykes*, 433 U.S. 72, 89 (1977). Because of the passage of time between the original trial and the eventual litigation of the new claim before the federal habeas court, this gamble would be unfair to the State; by the time a writ of habeas corpus is granted, the probability of retrial is unlikely in light of "erosion of memory" and "dispersion of witnesses." *Engle*, 456 U.S. at 127. Additionally, Ward's suggested rule would sanction the regular circumvention of state procedural rules. *See id.* at 128-29. The requirement that a prisoner demonstrate actual innocence, or cause for failure to adhere to state procedural rules and actual prejudice resulting from the alleged constitutional violation, prevents sandbagging and respects the "States's sovereign power to punish offenders and their good-faith attempts to honor constitutional rights." *Id.* at 128.

Even if the cumulative effect of Ward's claims arising from the ex parte conversations, the alleged perjury, and the alleged *Brady* violation rose to the level of a structural violation—an issue this Court need not reach—the structural nature of the claim would not excuse Ward's failure to present the claims to the State courts. Rather, had Ward

argued cause for the failure to adhere to the State's procedural rules and demonstrated any actual prejudice resulting from the alleged constitutional violation, the appropriate moment to consider the nature of Ward's constitutional claim would have been during the evaluation of those arguments. *See Engle*, 456 U.S. at 129. As Ward has not argued cause and prejudice or that a fundamental miscarriage of justice would occur if his claims were not addressed, the district court was correct to find the claims barred by the procedural default doctrine.

### III. Conclusion

For the foregoing reasons, we AFFIRM the decision of the district court.

A true Copy:

Teste:

_____

*Clerk of the United States Court of Appeals for the Seventh Circuit*