RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 15a0219p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

JOSEPH AMBROSE,

                *Petitioner-Appellee,*

    *v.*

RAYMOND BOOKER, Warden,

                *Respondent-Appellant.*

No. 14-1780

> Appeal from the United States District Court
> for the Eastern District of Michigan at Bay City.
> No. 1:06-cv-13361—Thomas L. Ludington, District Judge.

Argued: April 28, 2015

Decided and Filed: September 4, 2015

Before: MERRITT and ROGERS, Circuit Judges; POLSTER, District Judge.[*]

_____

### COUNSEL

**ARGUED:** B. Eric Restuccia, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellant. Bradley R. Hall, OFFICE OF THE FEDERAL DEFENDER, Lansing, Michigan, for Appellee. **ON BRIEF:** B. Eric Restuccia, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellant. Bradley R. Hall, James R. Gerometta, OFFICE OF THE FEDERAL DEFENDER, Lansing, Michigan, for Appellee.

ROGERS, J., delivered the judgment of the court, and an opinion in which POLSTER, D.J., joined in part. MERRITT, J., (pp. 20–22), concurred in the judgment, and delivered a separate concurring opinion. POLSTER, D.J. (pp. 23–24), delivered a separate opinion concurring in part and dissenting in part.

---

[*]The Honorable Dan Aaron Polster, United States District Judge for the Northern District of Ohio, sitting by designation.

1

———————————

**OPINION**

———————————

ROGERS, Circuit Judge.   This case involves Joseph Ambrose's procedurally defaulted claim challenging the constitutionality of the jury selection computer program in Kent County, Michigan.   In April 2001, a Kent County jury convicted Ambrose of armed robbery.   At jury selection, Ambrose did not object to the racial composition of the jury venire.   In July 2002— after Ambrose had exhausted his direct appeal—the Grand Rapids Press published a story about a computer glitch in the Kent County software that had systematically excluded African-Americans from the jury pool from April 2001 to early 2002.   In light of these revelations, Ambrose filed a motion for post-conviction relief in state court, alleging that his Sixth Amendment fair-cross-section right had been violated.   However, because Ambrose failed to object to the composition of the jury venire at trial, the state courts denied relief.   Ambrose then filed a 28 U.S.C. § 2254 habeas petition in federal court, which the district court conditionally granted on March 10, 2011, having found cause to excuse his procedural default and a *prima facie* violation of his Sixth Amendment fair-cross-section right; however, on June 28, 2012, we remanded his case for a determination of whether there was actual prejudice.   *Ambrose v. Booker*, 684 F.3d 638, 652 (6th Cir. 2012).   The district court—interpreting and applying the prejudice standard set forth in *Ambrose*, 684 F.3d at 652—subsequently found that Ambrose had sufficiently demonstrated actual prejudice to excuse his procedural default and had established a *prima facie* violation of his Sixth Amendment fair-cross-section right.   The respondent appeals. Because Ambrose has failed to show actual prejudice, the district court erred in excusing Ambrose's procedural default.   We therefore do not reach the merits of his Sixth Amendment claim.

On April 19, 2001, a jury of an unknown racial composition[1] convicted Joseph Ambrose of two counts of armed robbery, one count of carjacking, and one count of felony-firearm possession following a trial described by the district court as follows:

———————————

[1]The parties agree that they "do not know what the racial composition of Mr. Ambrose's jury was but that [they] do know that Spencer Anderson and Lee Morgan[, the two victims,] were both African-Americans."

Ambrose's trial proceedings began on April 16, 2001, and lasted through April 19, 2001. . . . [During opening statements,] [t]he State summarized the evidence as it was presented during the preliminary hearing: Anderson and Morgan were driving around "doing a number of chores" when they came across Ambrose, who asked for a ride. Anderson and Morgan picked up Ambrose, along with his friend Rickie Hicks, and Ambrose directed Anderson to drive into an alley. According to the prosecutor, Ambrose and Hicks then robbed Anderson and Morgan at gunpoint and made off with cash, jewelry, and the 1992 Ford Taurus Anderson was driving.

Counsel for Ambrose painted a different picture. He asserted that Morgan and Anderson were "the only two individuals who were there" during the incident, but that "their story ha[d] changed" from the first time they talked to the police. Ambrose's counsel also indicated that there were "significant discrepancies" between Anderson's and Morgan's accounts of the robbery."

[. . .]

Anderson testified [second]. He explained that on the day of the incident, he decided to go to his "cousin Corey's house" which was "[n]ot even a block" from where he lived with his mother. Despite the proximity of the two residences, Anderson drove a car. He had access to his own car and his mother's 1992 Ford Taurus, but he decided to take his mother's car instead of his own (which was available and operable), "[b]ecause—well, [his] car was in the driveway and hers was on the street. So, when [he] got up, [he] had just took her car." Anderson testified that he drove to Corey's house and Morgan was already there.

Anderson indicated that he and Morgan decided to go "get something to eat," so they got in his mom's car and drove to Food Town—only three blocks away After getting something to eat, Anderson and Morgan decided to go to Ms. Tracey's, a party store. Anderson claimed that there was "no particular reason" for the trip.

After leaving Food Town and driving for what he estimated was "20 minutes," Anderson claimed Ambrose (. . . who he referred to as PeeWee) "flagged" him down. Although Ambrose was with "another kid" that Anderson did not know, Anderson was not concerned. He circled the block and stopped; Ambrose asked for a ride and Anderson agreed.

Anderson was under oath when he testified during the September 28, 2000 preliminary hearing. On that date, he unequivocally indicated that he had seen Ambrose at a mutual friend's house on more than one occasion; in fact, he testified that that was where he originally met Ambrose: "[Ambrose] knows a friend of mine, and they used to always hang out at his house. That's wher[e] I met him at first." During the trial, however, Anderson indicated that he and Ambrose had no mutual friends and had never visited the same location, only that he had "seen [Ambrose] around."

Regardless of how well Anderson knew Ambrose, he invited Ambrose and the unknown man to get into the backseat of his mother's Ford Taurus. Ambrose then directed Anderson to his intended destination—unknown to Anderson at the time—and Anderson complied. Anderson testified that after they had traveled "two blocks, maybe three," Ambrose "was telling [him] that [Ambrose] had a gun."[2] Anderson claims that Ambrose then directed him into an alley, "pull[ed] out a gun," and said, "Hand us everything."

According to Anderson, he turned around and Ambrose was pointing "a machine gun" at him. Anderson claimed that the weapon was "completely out and visible[,]" that Ambrose had his "arm extended pointing [the gun] toward Anderson,]" and that the weapon was between 12 and 14 inches long. Anderson testified that after he saw Ambrose's gun, he looked at Morgan with a "What's going on here?" expression and stopped the car in the middle of the alley. Ambrose asked for Anderson's wallet, which Anderson claimed had $100 cash in it. Anderson held up his wallet, and the previously unknown man assisting Ambrose—who Anderson identified as Rickie Hicks (Hicks)—collected it while Ambrose held the machine gun.

Anderson testified that Ambrose—gun in hand—ordered him and Morgan out of the car and that they immediately complied. Notably, Anderson indicated that he "got out first" and that "once [Morgan] seen that I was exiting the car, he got out." Hicks then got out of the backseat, grabbed two necklaces from around Anderson's neck, and got "in the front seat in the driver's side seat . . . ." Of course, Anderson claimed Hicks also grabbed a gold necklace from around Morgan's neck as Morgan was getting out of the car. Then Hicks and Ambrose made off with the loot (the cash, necklaces, and the car).

After Ambrose and Hicks drove away, Anderson and Morgan "ran to Mrs. Guyton's house." Mrs. Guyton goes to church with Anderson's mother, and he testified that she was "a real close family friend . . . ." Anderson used Mrs. Guyton's phone to call the police, and then he left and went home [because "she's elderly and [he] didn't want her to get involved in this"]. Police officers then made contact with Anderson at his home about a "half hour" after the incident occurred.

Anderson was called in to the Grand Rapids Police Department on May 22, 2000. He told the police he had been robbed "by PeeWee" and identified Ambrose from a photo array. Approximately two weeks later, Anderson identified Hicks during a lineup in the county jail.

Notably, during cross examination, Ambrose's attorney asked Anderson if he was aware of what a "drug rental" was. Counsel explained that a drug rental involves one person loaning their car to another person in exchange for drugs. Anderson denied ever having heard of such a practice, and emphasized that such an

---

[2]Although Anderson first claimed that Ambrose said he had a gun, he later testified during cross examination that Ambrose did not ever say, aloud, that he had a gun.

exchange is not why Ambrose had his mother's car (as opposed to an armed robbery and car jacking).

Morgan took the stand directly after Anderson . . . . Contrary to what Anderson said—but consistent with his preliminary examination testimony—Morgan testified that he and Anderson had no destination in mind while driving around prior to encountering Ambrose. According to Morgan, and again contrary to Anderson's testimony, the two men had been driving around for up to an hour before Ambrose flagged them down. While Anderson claimed that he and Morgan stopped for some food, Morgan testified that the two did not stop anywhere.

Morgan related that he and Anderson were cruising around until he heard "PeeWee"—Ambrose—"scream, 'Hey, Spencer,' or something like that." Morgan indicated that "at first [he] like waved, but then [he] told Spencer that [Ambrose] was calling him." Then, just as Anderson described, Morgan claimed they circled the block and stopped for Ambrose. Morgan said Ambrose asked for a ride "to a store or something like that" and then got into the backseat with "Rickie Hicks" (whom Morgan did not know at the time). Although he did not know Hicks, Morgan "knew who [Ambrose] was."

According to Morgan, Ambrose directed Anderson to drive into an alley, and then Morgan could hear noises "[l]ike metal something." Morgan represented that Ambrose then said, "Give me everything I need, all of that." Morgan claimed Anderson attempted to "plead" with Ambrose, saying "Oh, no. We better than that. Like, we supposed to be like close or whatever." But, according to Morgan, Ambrose simply responded, "I need everything." Although Anderson claimed Ambrose's gun was over a foot long, Morgan never saw it:

> Q: Did you actually see [Ambrose] aim the automatic weapon at
> you?
>
> A: No, Spencer seen it. I never saw it. From where he was
> located behind me, I heard the noises and kind of assumed it
> was a gun.

Morgan testified that, at Ambrose's direction, Hicks checked the two victims for valuables. According to Morgan, Hicks took Anderson's wallet and chains, and his chain, before driving off. Unlike Anderson, however, Morgan testified that *he* got out of the car first after he and Anderson were ordered out: "[Ambrose] orders us to get out the car. He orders us to step out the car and I step out first. And, while I'm stepping out in front and looking like over to Spencer to make sure he don't end up shot or something, because he kind of took longer than me to get out the car." Indeed, Morgan was "sure" he exited the car before Anderson. Like Anderson, Morgan testified that Hicks then got in the driver's seat while Ambrose remained in the back, and the two men drove away.

Morgan recalled that he and Anderson then ran to Mrs. Guyton's to call the police, but Morgan's and Anderson's accounts of the subsequent events differ yet

again.  While Anderson testified that he went back to his house alone, Morgan claims to have gone with Anderson "and then that's when the police arrived and took the report."

During cross examination, Ambrose's counsel also asked Morgan if he knew what a "drug rental" was, and once again Morgan's testimony differed . . . from Anderson's:

> Q: Do you know what a drug rental is?
>
> A: Yes, sir.
>
> Q:  What is [a drug rental]?
>
> [. . .]
>
> A:  Well, my—you probably give drugs to get something from somebody or . . . somebody give you drugs to get something from you.
>
> Q: And certainly you've heard or understand that sometimes people will allow somebody to use their vehicle for a short period of time[] so they can get some drugs?
>
> A:  Yeah, but that didn't happen in this case, sir.
>
> Q:  Okay.  But that is what—that's at least part of what a drug rental is, would you agree?
>
> A:  Yes, sir.
>
> Q:  Okay.  Does Spencer know what that is, do you know?
>
> A:  He should.

Morgan and Anderson were the only two witnesses who possessed first-hand knowledge of the events in the alleyway with Ambrose and Hicks. . . . After Morgan testified, the State called Mary Jane Williamson, an employee with the Grand Rapids Public Schools.  She simply established that Ambrose and Morgan went to Youth Development School together and were in the same class during the 1996-97 school year.

The State next called Carol Stahl as a witness, an Officer with the Grand Rapids Police Department.  Officer Stahl spoke with both Anderson and Morgan after the incident, at approximately 2:30 p.m. She established that Anderson and Morgan said one of the suspects was Ambrose, who they referred to as "PeeWee." According to Officer Stahl . . . , both Anderson and Morgan told her that after the

robbery, Ambrose "got in the passenger side front" of the car before Hicks drove away. She documented the statement in her report.

Officer Stahl indicated in her report that she was unable to locate the alley Anderson and Morgan claimed to have been robbed in, although she "had them try and locate the location . . . on the map." She also testified that either Morgan or Anderson represented that a phone was taken during the robbery.

[T]he State [next] called Harvey Barker, another Officer with the Grand Rapids Police Department. Officer Barker found the Ford Taurus that Anderson was driving just after 12:00 a.m. the morning of May 20, 2000. He recalls finding a cell phone in the vehicle, along with a cell phone cord, and Anderson's wallet and ID. Officer Barker also found a gold ring, a silver ring, and a watch on the seats in the vehicle.

[The final] day of Ambrose's trial began with the State calling Dean Garrison as a witness. Mr. Garrison is employed by the Grand Rapids Police Department as crime scene technician in the Forensic Services Unit. On May 20, 2000, he was called to the location of the allegedly stolen Ford Taurus to "fingerprint" and "examine" the vehicle. Mr. Garrison recalled seeing a "necklace . . . in the driver's seat somewhere." Mr. Garrison also laid the foundation for the introduction of a fingerprint that he was able to lift from the car.

The State then called William Wolz, a latent print examiner with the Grand Rapids Police Department. Mr. Wolz examined the print collected by Mr. Garrison, but it was "not usable."

The third witness called on the last day of trial was Lena Guyton, the woman who allowed Anderson and Morgan to use her telephone to call the police. Ms. Guyton testified that Anderson and Morgan came to her house and asked to use her phone. She agreed, but "didn't hear who [Anderson] called. [She] didn't try to listen . . . but [she knows Anderson] said he was gonna call the police and [she knows] that later on the police did come but [Anderson] had left."

The State also called Anderson's mother, Doris Littles, to testify in the case. Ms. Littles was working the day of the incident, and she could not remember if she "called home" or if she got "a message at work to call home," but for whatever reason she did call, talked to Anderson, and he informed her that "somebody had took the car and that he had just got through talking to the police officers. Ms. Littles testified that when she recovered the car she was "just really . . . surprised it wasn't all tore up or anything." According to Ms. Littles, the "only" thing that was "out of the ordinary" with the car was what the police themselves did while examining it.

The phone found in the car was not Ms. Littles. She did not "know anything" about the silver and gold rings found in the car. Finally, she did not know anything about "a chain or necklace that was found" in the car.

The State then recalled Anderson. He established that the phone recovered in the car was his, but that he never got a chance to examine the rings or the watch or

the necklace that were found to determine "whether they belong[ed] to [his] sisters or to anybody. The State also recalled Detective Griffin. He indicated that "Mr. Anderson came into the police department and [Detective Griffin] conducted an interview with him. [Anderson] provided a nickname of Pee Wee and gave the location of where he believed Pee Wee to live." On cross examination, Ambrose's counsel established that Detective Griffin never attempted to discuss with Anderson the rings, watch, and necklace discovered in his mother's car.

After Detective Griffin finished testifying for the second time, the State rested its case in chief. The defense did not attempt to offer any evidence and also rested. Counsel then moved into closing arguments. The State asserted, as it had throughout the case, that the evidence supported the charges—that Ambrose had robbed Anderson and Morgan at gunpoint and then taken Anderson's car. The defense, on the other hand, emphasized the differences between Morgan's and Anderson's testimony and suggested that this had been a "drug rental" gone awry. Counsel said that "[w]hatever Mr. Anderson and Mr. Morgan were up to that day, at some point they became separated from the car and [Anderson] knew he had to account to his mother for what happened to that car and this is the story they came up with."

The jury found Ambrose guilty on three counts, and on June 19, 2001, following conviction, the court sentenced Ambrose to two years' imprisonment on the felon in possession of a firearm charge; ten to fifty years on the carjacking charge, to run consecutive to the two years for felony-firearm possession; and fifteen to sixty years on each of the armed robbery charges, to "run concurrent with the carjacking sentence and consecutive" to the two years for felony-firearm possession.

On July 30, 2002, [after Ambrose had been convicted,] the Grand Rapids Press reported that a computer glitch had [had] an impact on Kent County's system for selecting jury venires. The glitch was introduced accidentally by the county when it assumed control of the jury selection computer program from a private vendor in April 2001. The problem came to light in 2002, when a local high school teacher, Wayne Bentley, completed a study of minority representation on Kent County juries. Bentley found that the underrepresentation of minorities was statistically significant, and shared his findings with county officials. The county subsequently conducted an internal study that revealed that "nearly 75 percent of the county's 454,000 eligible residents were excluded from potential jury pools since spring 2001" and that "[m]any blacks were excluded from . . . jury pools due to a computer glitch that selected a majority of potential candidates from the suburbs." The chief judge of the Kent County Circuit Court, George Buth, stated, "There has been a mistake—a big mistake."

*Ambrose v. Booker*, 684 F.3d 638, 640–41 (6th Cir. 2012).  In light of these revelations, Joseph Ambrose, who had been convicted on April 19, 2001—a time period during which jury pools were affected by the computer glitch—initiated state post-conviction proceedings, claiming that he had been denied his Sixth Amendment right to be tried by a jury drawn from a fair cross-section of the community.  The trial court denied relief, in part, because Ambrose had failed to object to the venire panel before the jury was empaneled.  The Michigan Court of Appeals denied leave to appeal, as did the Michigan Supreme Court.  *People v. Ambrose*, 706 N.W.2d 16 (Mich. 2005).

On July 25, 2006, Ambrose filed his habeas petition in district court, raising only the Sixth Amendment fair-cross-section claim.  The district court referred the matter to a magistrate judge, who held an evidentiary hearing at which four items of evidence were introduced: (1) the testimony of Wayne Bentley, a Grand Rapids school teacher and member of the Kent County jury commission who uncovered the disparate representation; (2) the November 14, 2007 deposition of Terry Holtrop, the case management manager for Kent County; (3) the report of Dr. Paul Stephenson, a statistician who evaluated the impact of the glitch; and (4) the report of Dr. Edward Rothman, who analyzed the composition of the Kent County jury pool between January 1998 and December 2002.  For a more detailed description of the hearing testimony and reports, see *Ambrose*, 684 F.3d at 641–43.

Based on the magistrate judge's recommendation, the district court granted relief. *Ambrose*, 781 F. Supp. 2d at 545–46.  First, the district court held that Ambrose had not procedurally defaulted his claim because he had shown good cause to excuse his default, namely that he could not have known of the computer glitch at the time his jury was empaneled.  *Id.* at 542–43.  Second, the district court found that the number of African-Americans in the jury pool was not "fair and reasonable in relation to the number of such persons in the community."  *Id.* at 543–44.  Finally, the district court held that the systematic exclusion did not need to be intentional and that Ambrose had shown a *prima facie* violation of his Sixth Amendment fair-cross-section right.  *Id.* at 545.  The district court granted a conditional writ of habeas corpus and Respondent appealed.

On appeal, we held that Ambrose had shown cause to excuse the procedural default "because the factual basis for the claim—the computer glitch—was not reasonably available to counsel, and petitioners could not have known that minorities were underrepresented in the *jury pool* by looking at the *venire panel*." *Ambrose*, 684 F.3d at 645. However, we held that "[h]aving shown cause, petitioners must [also] show actual prejudice to excuse their default, even if the error is structural." *Id.* at 649. Consequently, we remanded the case to district court to address whether Ambrose could show actual prejudice. To guide the district court's analysis, we explained:

> We are then left with the question of the proper standard on remand. We are guided in part by the Eleventh Circuit's analysis of a similar question in *Hollis v. Davis*, 941 F.2d 1471, 1480 (11th Cir. 1991). In that case, the petitioner claimed that his counsel was ineffective for failing to object to Alabama's systematic exclusion of African-American jurors from grand and petit juries. To excuse this default, the *Hollis* court required that petitioner show actual prejudice, which involved determining whether there was a reasonable probability that "a properly selected jury [would] have been less likely to convict." *Id.* at 1482 [emphasis added]. The Eleventh Circuit's analysis is persuasive. The most important aspect to the inquiry is the strength of the case against the defendant.[3] As the Eleventh Circuit reasoned, "a transcript could show a case against [petitioner] so strong,

---

[3]At this point we added the following footnote:

> This is not to say that the race of the jurors, defendant, and victim must be ignored. For example, the Fifth Circuit recognized actual prejudice in a case involving an all-white jury, a black defendant, and a white victim who was allegedly raped. *See Huffman v. Wainwright*, 651 F.2d 347, 350 (5th Cir. 1981). Relying on *Huffman*, the Eleventh Circuit reasoned:

> > In *Strickland* terms, if we compared the result reached by an all white jury, selected by systematic exclusion of blacks, with the result which would have been reached by a racially mixed jury, we would have greater confidence in the latter outcome, finding much less probability that racial bias had affected it. This principle was recognized in *Huffman*, 651 F.2d at 350:

> > > Huffman was a black man accused of raping a white woman. A mixed-race jury might clearly have a special perception in a mixed race case. His defense was consent. His jury was all white. Although a constitutionally drawn jury may be all white, or all black, depriving Huffman of the chance of having a mixed-race jury would seem to meet the prejudice requirements for relief.

> *Hollis*, 941 F.2d at 1482 (internal citations and quotation marks omitted).

and defense so weak, that a court would consider it highly improbable that an unbiased jury could acquit." *Id.* at 1483 (internal quotation marks omitted). In that circumstance, actual prejudice would not be shown.

> Although the instant petitions do not involve a *Strickland* claim, this standard is appropriate because it balances the competing demands of constitutionally protected equal protection interests and comity toward the state courts. We recognize that the application of the actual prejudice standard in cases such as these presents a particularly challenging charge to the district courts below to answer the question, "what would have happened?" The law nonetheless requires that the question be answered—with a careful look at the transcripts involved, and with judgment that takes into account a fair balance of the competing interests of comity toward the final judgments of the state's criminal processes and the protection of constitutional equal protection interests.

*Ambrose*, 684 F.3d at 652.

On remand, the district court held an evidentiary hearing to determine whether there was a "reasonable probability that a more diverse jury would have been less likely to convict." To answer that question, Ambrose called Dr. Samuel Sommers—"the nation's foremost expert in the fields that are inherently implicated by the Sixth Circuit's standard: 'the influence of race on social perception and judgment,' 'the relationship between race and legal decision-making,' and 'the psychology of intergroup relations and racial bias.'" Dr. Sommers testified that: (1) "research literature demonstrates that more diverse juries are less likely to convict;" (2) "[t]here remains an increased likelihood of a . . . conviction with a greater percentage of White jurors even in a strong case,"[4]; (3) "all-White . . . jurors . . . behave[] very differently in racially diverse jury settings," because "when people enter any kind of group discussion or group interaction and believe that there is going to be disagreement and divergent opinions, people sort of scrutinize information more carefully,"[5]; and (4) in racially charged cases, "White people might actually be more conscious of biases and try to counteract [them]." Finally, Dr. Sommers

---

[4]On cross examination, however, Dr. Sommers conceded that the "weight of the evidence may play the largest role in conviction decisions." He explained, "I wouldn't be surprised if you would see very high conviction rates in [a trial with very strong evidence against the defendant] regardless of who the jury is. But again, what the research suggests is that those rates would be just . . . a little bit higher with an all-White jury."

[5]Dr. Sommers, however, indicated that because "African-American jurors like everybody else are a diverse group of people" with "[d]ifferent background experiences," "[d]ifferent education experiences," and "[d]ifferent social experiences," there is "no way" to offer a certain, absolute statement such as "any one person . . . would have made a difference on any particular case."

explained that "the research literature indicates a general finding that when you see a particular viewpoint or life experience or attitude on an issue that seems to vary by demographic, that when you change . . . that demographic on the jury, and make that demographic more likely to be on that jury, you also increase the likelihood that that perspective or viewpoint or life experience is shared during those deliberations."

Following Ambrose's evidentiary hearing, the district court once again conditionally granted Ambrose's petition for writ of habeas corpus. First, after finding that a less demanding, "less likely to convict" prejudice standard from *Hollis v. Davis*, 941 F.2d 1471, 1483 (11th Cir. 1991)—and not the *Strickland v. Washington*, 466 U.S. 668, 694 (1984), prejudice standard— applied, the court found that Ambrose had sufficiently shown "actual prejudice" to excuse his procedural default for two *independent* reasons: (1) because, according to the evidence of Dr. Sommers, more diverse juries are statistically less likely to convict, a properly selected jury would have been less likely to find Ambrose guilty of his charges,[6] and (2) because the "strength of the evidence against Ambrose was far from overwhelming," the State could not "overcome Dr. Sommers's indication that a properly selected jury would have been less likely to convict." The court reasoned:

> The prosecution's case relied upon two eyewitnesses who contradicted each other in many respects. . . . [T]here was no other evidence linking Ambrose to the case. Anderson's and Morgan's property was not recovered in Ambrose's possession. The machine gun he allegedly used during the robbery was never recovered. No evidence was found linking Ambrose to the vehicle he supposedly stole. . . .

---

[6]The district court found Dr. Sommers's testimony—that, essentially, African-Americans are less likely to convict than Whites—particularly helpful because:

> relevant data indicate that had Ambrose's venire been constitutionally assembled, the presence of approximately three African Americans could be expected. That being the case, there is a 66.8 percent chance that one of those three would make it to the petit jury. So this Court concludes that there is a reasonable probability that, had Ambrose's jury venire been representative of Kent County (and included three African Americans), at least one African American would have been selected for his petit jury.

The district court's statistical analysis, however, appears to suffer from one fatal flaw: namely, it appears to rely on the premise that the computer glitch resulted in the complete exclusion, rather than simply the underrepresentation, of minorities in the petit jury. Thus, the district court asked if, "[b]eginning with three potential African-American jurors in a venire[—the number expected on a 40 person, representative Kent County jury venire—]is it likely that one would make it to the petit jury?" The better analysis would examine Ambrose's odds of having an additional African-American on the petit jury if three African-Americans—as opposed to the average two African-Americans during the computer glitch period—had been included in the jury venire.

[T]here are also numerous unresolved questions that simply went unexplained by the prosecution. Why did Anderson take his mother's car the day of the robbery instead of his own? Indeed, why did Anderson decide to take a car at all? He testified that he traveled less than one block to his cousin's house. If there was a carjacking and robbery, why were a cellphone, gold and silver jewelry, and a watch left in the stolen car after it was supposedly abandoned? Why would Ambrose wave down two men he knew and rob them at gunpoint, knowing how easily they could identify him? Why were Anderson and Morgan unable to locate the alley in which they were robbed? . . . Accordingly, the prosecution's case was not so strong, and the defense so weak, as to overcome Dr. Sommers' indication that a properly selected jury would have been less likely to convict Ambrose. . . .

[Finally,] [t]he evidence reasonably allowed for competing inferences—whether Ambrose took Anderson's and Morgan's property by force or received the car in exchange for drugs—and the subjective perceptions, life experiences, and common sense of jurors, as shaped by their individual racial and cultural backgrounds, could carry considerable weight in deciding the facts. Based on the relevant facts and circumstances, when comparing the result reached by a jury "selected by systematic exclusion of blacks, with the result which would have been reached by a racially mixed jury," the Court would have greater confidence in the latter outcome, finding much less probability that racial bias had affected it. *Ambrose*, 684 F.3d at 652 n.4.

Having found that Ambrose demonstrated cause and prejudice to excuse his procedural default, the court then held that Ambrose had also established a *prima facie* violation of the Sixth Amendment fair cross-section requirement. In particular, the court concluded that "the representation of African Americans [in the jury venire] was not fair and reasonable in relation to their number in the community," and "that the exclusion of potential African-American jurors was 'systematic.'" The court therefore ordered conditional habeas relief.

Respondent now appeals the district court's grant of conditional habeas relief, claiming that (1) Ambrose failed to show actual prejudice to excuse his procedural default, and (2) the district court erred in finding that the representation of African-Americans in the venire from which his jury was selected was not fair and reasonable.

As an initial matter, the district court on remand should not have applied a less stringent *Hollis*—rather than the *Strickland*—prejudice standard to determine whether to excuse Ambrose's procedural default. The "actual prejudice" inquiry outlined in *Ambrose v. Booker*, 684 F.3d 638, 652 (2012), was intended to mirror the inquiry required by *Strickland v. Washington*, 466 U.S. 668, 694 (1984). Courts must consider whether, in light of the

underrepresentation of African Americans in the jury venire, "there is a reasonable probability that . . . the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. Stated another way, courts must ask, is there a reasonable probability that a different (*e.g.*, properly selected) jury would have reached a different result, "a probability sufficient to undermine confidence in the outcome of the trial." *Id*.

The district court expressed some confusion as to whether the *Strickland* or *Hollis* prejudice standard applies,[7] ultimately applying a "*Hollis* standard" which, according to the district court, asks only whether there is a "reasonable probability that a proper jury would have been *less likely* to convict." *Hollis v. Davis*, 941 F.2d 1471, 1482 (11th Cir. 1991). The *Ambrose* opinion, however, stated: "Although the instant petitions do not involve a *Strickland* claim, *this standard* is appropriate because it balances the competing demands of constitutionally

---

[7]The district court stated:

> The discrepancy [in regard to which actual prejudice standard to apply] stems, in part, from the *Ambrose* opinion itself. When describing the prejudice standard to be applied by this Court, and others facing the difficult question presented here, the Sixth Circuit cited to an Eleventh Circuit case involving a petitioner's claim "that his counsel was ineffective for failing to object to Alabama's systematic exclusion of African-American jurors from grand and petit juries." *Ambrose*, 684 F.3d at 652 (citing *Hollis*, 941 F.2d at 1480). The Sixth Circuit then explained that to excuse the default in *Hollis*, the Eleventh Circuit required the petitioner to demonstrate "actual prejudice, which involved determining whether there was a reasonable probability that a properly selected jury would have been less likely to convict." *Ambrose*, 684 F.3d at 652 (internal quotation marks, brackets, and citation omitted). The court went on to indicate that "[a]lthough the instant petitions do not involve a *Strickland* claim, this standard is appropriate because it balances the competing demands of constitutionally protected equal protection interests and comity toward the state courts." *Id.* So when the Sixth Circuit referred to "this standard," did it mean *Strickland*'s standard for prejudice (a reasonable probability that a proper jury would change the result of Ambrose's trial), or the standard for prejudice the court lifted from *Hollis* (a reasonable probability that a proper jury would have been less likely to convict Ambrose)?
>
> Contrary to the State's suggestion, the *Strickland* standard for prejudice does not apply here; Ambrose is not presenting a claim based on the ineffective assistance of counsel. So Ambrose need not demonstrate a reasonable probability that a properly selected jury would not have convicted him, he need only show a reasonable probability that a properly selected jury would have been less likely to convict. Had the Sixth Circuit believed Ambrose must demonstrate that a properly selected jury would not have convicted him—because he is bound by *Strickland*'s standard for actual prejudice—it would have said so. It did not.
>
> Thus, when the court indicated that "[a]lthough the instant petitions do not involve a *Strickland* claim, this standard is appropriate[,]" *id.*, it is reasonable to assume the court was referring to the standard it outlined, based upon *Hollis*, only one paragraph before—not the *Strickland* standard itself. The reference to *Strickland* is better understood as indicating that although *Hollis* involved a *Strickland* claim, the prejudice standard set forth in *Hollis* (less likely to convict) is still applicable to this case, which does not include an ineffective assistance of counsel claim.

protected equal protection interests and comity toward the state courts." *Ambrose*, 684 F.3d at 652 (emphasis added). "This standard" refers to the *Strickland* standard—and not a different *Hollis* standard[8]—a reading that wholly aligns with our previous statement that "federal courts should not reverse state court decisions unless a petitioner can show that *the outcome would have been different.*" *Id.* at 651 (emphasis added).

The district court also should not have relied on Dr. Sommers' expert testimony—in which Dr. Sommers stated that racially diverse juries are less likely to convict than all-white juries—in making the court's "actual prejudice" determination. Dr. Sommers' testimony is not relevant to the "actual prejudice" determination because it: (1) does not support a finding that a different jury would have reached a different result; (2) lacks any individualized assessment of the case against Ambrose; and (3) relies on impermissible racial stereotypes. First, Dr. Sommers' testimony at best *only* supports a finding that a properly selected jury would have been *less likely* to convict—a standard that—as interpreted by the district court—requires little more than a showing of a mere *possibility* of prejudice. This finding does not meet the more exacting *Strickland* standard, namely that Ambrose had to show that, with a properly selected jury, there was a reasonable probability that the outcome of his trial "would have been different." *Ambrose*, 684 F.3d at 651−52. To find that there is a reasonable probability that with a properly selected jury a petitioner's trial outcome would have been different, a court must do more than simply find that, *in general*, a more racially diverse jury is less likely to convict; such a finding says nothing about the case at hand. "To establish actual prejudice, a petitioner must show not merely that the errors at his trial created a *possibility* of prejudice, but that they worked to *his actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Hollis*, 941 F.2d at 1480 (quotations and citation omitted).

Second, Dr. Sommers' testimony lacked any individualized assessment of the evidence against Ambrose, the factor we repeatedly identified as the "most important aspect to the inquiry." *Ambrose*, 684 F.3d at 652. To permit a finding of actual prejudice based solely on

---

[8]It is not even entirely clear that there is a separate, less demanding *Hollis* standard; rather, the *Hollis* court appears to have used the "less likely to convict" language as an alternative way to phrase "probability of a different outcome" in cases where unconstitutional jury selection is alleged. *See Garcia-Dorantes v. Warren*, No. 13-2439, __ F.3d. __, n.8.

such expert testimony would essentially eliminate the actual prejudice requirement in all but the most extreme cases (*e.g.*, where the evidence against the defendant is so airtight that no reasonable jury could vote to acquit).[9]

Third, reliance on the type of evidence provided by Dr. Sommers rests solely on general racial characteristics, considerations flatly inconsistent with the underlying theory of *Batson v. Kentucky*, 476 U.S. 79 (1986) and its progeny, as Justice Marshall explained, in his *Batson* concurrence.

> Exclusion of blacks from a jury, solely because of race, can no more be justified by a belief that blacks are less likely than whites to consider fairly or sympathetically the State's case against a black defendant than it can be justified by the notion that blacks lack the "intelligence, experience, or moral integrity," *Neal v. Delaware*, 103 U.S. 370, 394 (1881), to be entrusted with that role.

*Batson,* 476 U.S. at 104–05 (Marshall, J., concurring).

Ultimately, under the stricter *Strickland* standard, and without consideration of Dr. Sommers' testimony, Ambrose has failed to show actual prejudice to excuse his procedural default. Though a careful review of the record reveals some inconsistencies in the trial testimony of the two victims, and the prosecution, admittedly, failed to explain why Ambrose—after carjacking the victims at gunpoint and stealing their possessions—would later abandon the car with a cell phone, gold and silver jewelry, and a watch still inside, these issues on their own do not create a reasonable probability that a different jury would have reached a different result, a probability sufficient to undermine confidence in the outcome. "The most important aspect to

---

[9]To be sure, the district court did not entirely disregard our direction to consider the strength of the evidence against the defendant in making an actual prejudice determination. However, the court appeared to frame the use of such evidence as a way to rebut the presumption that a more racially diverse jury would be categorically less likely to convict, rather than as the focal point of the actual prejudice inquiry:

> It is important to remember that the Sixth Circuit emphasized that in any given case, there may be a transcript demonstrating a case "so strong, and defense so weak, that a court would consider it highly improbable that an unbiased jury could acquit" regardless of its racial composition. *Ambrose*, 684 F.3d at 652 (citation omitted). As the *Ambrose* court established, in such circumstances, "actual prejudice would not be shown." *Id.* Of course, this is no reason to ignore Dr. Sommers' testimony, or the research he relied upon, which establish that more diverse juries are less likely to convict categorically. It is simply a method for concluding that *despite* the fact that more diverse juries are less likely to convict, actual prejudice still may not exist in some cases based on the overwhelming strength of the evidence against a defendant.

the [actual prejudice] inquiry is the strength of the case against the defendant," which requires courts to take a "careful look at the transcripts involved." *Id.*

Here, the evidence implicating Ambrose in the carjacking and robbery is very strong. The two victims at trial provided the same basic narrative about the incident: they were carjacked and robbed at gunpoint by Ambrose, immediately contacted the police at the home of Anderson's mother's friend, gave statements to the police about the robbery, and picked Ambrose out as the gunman. All of these statements, with the exception of what happened during the carjacking itself, were corroborated by later testimony. Anderson's mother's friend testified that the two victims had visited her home, where they borrowed the phone to call the police. The victims' statements taken by the police shortly after the carjacking and robbery occurred tracked their trial testimony, with the exception of Ambrose's location in the car as the car was driving away. And both victims picked Ambrose out of a photo array, a fact confirmed by police testimony. Though no physical evidence linked Ambrose to the crime—the victims' property was not recovered in Ambrose's possession and police never found the machine gun allegedly used during the robbery—the victims' accounts of the incident provided strong evidence against Ambrose.

It is true that the victims' testimony, at times, conflicted with each other's—on issues such as whether they "had a destination in mind" while driving, who exited the car first, whether Mr. Morgan accompanied Mr. Anderson home (a point later clarified by police testimony), and where Ambrose sat in the car; however, these issues were all minor—with some of the conflicting assertions likely simple mistakes—and did little, if anything, to undermine the victims' broader narrative. Though the two contradictory statements made by one of the witnesses at trial—that "he and Ambrose had no friends in common and had never been at the same location" and that he had handed cash directly to Ambrose, despite having previously testified that he had met Ambrose before and had handed his wallet to Hicks—are arguably more concerning, they are nevertheless insufficient on their own to undermine confidence in the trial's outcome.

In stark contrast to the strength of the State's case, Ambrose's defense—premised on the victims' few conflicting and contradictory statements and a "drug-rental-gone-awry" theory—

was weak. Stated simply, Ambrose's contention that it is reasonably probable that a different jury would have accepted the defense theory that what occurred was simply a "drug rental" gone awry, rather than a carjacking and robbery, is belied by the facts. Though "a defendant in a criminal trial need not . . . produce any evidence," *United States v. Drake*, 885 F.2d 323, 323 (6th Cir. 1989), to successfully argue that it is reasonably probable that a different jury would have accepted the defense theory, and thus have reached a different result, a defendant must show that there is some support for that theory. Here, there was no such support. Aside from asking the victims if they knew what drug rentals were, and suggesting during closing argument that the victims had lost their car during a drug rental gone awry, the defense presented no evidence to corroborate the theory; in particular, defense counsel failed to impeach the character of the victims and offered no evidence tying the victims to drugs or any other criminal activity. And although Ambrose suggests that the drug rental theory could help explain why Ambrose—after allegedly carjacking and robbing the victims—would later abandon the car with valuables inside, it is more likely that the fact that possessions were later found in the car cuts the other way. Why would an individual who was renting out his car for drugs ever leave his wallet, cell phone and identification in the car? Ultimately, the scant discussion of the "drug rental" theory in the record, coupled with the strong eyewitness testimony implicating Ambrose, supports a finding that it is not reasonably probable that a different jury would have reached a different result in Ambrose's case.

In finding that Ambrose has not shown actual prejudice to excuse his procedural default, we reject the district court's conclusion that "Ambrose has raised a credible claim that on the facts of this case, '[a] mixed race jury might clearly have a special perception.'" Though the court reasoned that the "subjective perceptions, life experience, and common sense of the jurors, as shaped by their individual racial and cultural backgrounds" could have affected how they might have "evaluated" the victims' testimony and Ambrose's drug rental theory, this argument fails for two reasons. First, as the Respondent points out, there is nothing inherent in race or ethnicity that would give a juror special insight into a "drug rental" theory; rather, such an analysis appears more predicated on the experiences of jurors from urban and suburban settings. Since "[d]efendants are not entitled to a jury of any particular composition," *Taylor v. Louisiana*, 419 U.S. 522, 538 (1975), it follows that they are not entitled to a jury predisposed to better

"understand" their defense strategy.[10]　There is "no requirement that petit juries actually chosen must mirror the community and reflect the various distinctive groups in the population." *Taylor*, 419 U.S. at 538.　As the district court in *Garcia-Dorantes v. Warren*, 978 F. Supp. 2d 815, 824 (E.D. Mich. 2013) explained, "[t]he question is not whether the petitioner missed his chance to stand trial before a more merciful jury panel or a panel with a particular racial balance, but rather whether there is a reasonable probability that a different jury would have reached a different result."　Second, this argument sounds much like the stereotyping arguments courts have sought to avoid, see *Batson v. Kentucky*, 476 U.S. 79, 104–05 (1986) (Marshall, J., concurring), namely that because an individual is black, he is predisposed to "understand" what happens in the "streets" or be sympathetic to the defendant's case.

Because Ambrose failed to show actual prejudice to excuse his procedural default, his petition for writ of habeas corpus should have been denied.　We do not need to address the merits of his Sixth Amendment fair-cross-section claim.

The judgment of the district court is reversed and remanded for entry of judgment denying the writ of habeas corpus.

---

[10]Prosecutors, likewise, are not allowed to use race as a basis for peremptory challenges, even should they believe "that blacks are less likely than whites to consider fairly or sympathetically the State's case against a black defendant." *Batson*, 476 U.S. at 104 (Marshall, J., concurring).

_____

**CONCURRENCE**

_____

MERRITT, Circuit Judge, concurring.  I concur in the result reached in Judge Rogers's opinion, but my reasons are different.

First, the number of available black jurors in Kent County, Michigan, remains much below 10% — in line with the case from Kent County recently decided by the United States Supreme Court in 2010, *Berghuis v. Smith*, 559 U.S. 314, in which the Court held that the trial by an all-white jury in a similar situation did not violate the Sixth Amendment.  The Supreme Court observed that the number of non-white jurors seemed to be further substantially reduced because of social and economic factors leading potential black jurors at times to avoid serving by not responding to mail notice to appear.  The Supreme Court noted that in such situations where "members of the distinctive group" are a "small percentage of those eligible for jury service" we should be hesitant to find that the state engaged in "systematic exclusion" when the jury turns out to be all-white.  *Id.* at 329-30.  Based on the law of averages, along with the random nature of selecting the persons to be called for jury duty, there are likely to be many all-white juries in Kent County.  The Court found that in such situations "absolute disparity and comparative disparity . . . can be misleading," and rejected Sixth Amendment arguments, like those in the instant case, based on such abstract statistical measures.

Second, in the case before us, the number of available black jurors in Kent County, Michigan, is well below 10% so that by the law of averages many juries would be all white.  Yet in this case, we do not even know that there were no blacks on the jury because apparently no record was kept, and no record is available, about who was on the jury.  We do not know how many men or women, or how many blacks or Hispanics, were on the jury.  There may well have been one or more black members on the jury in this case.  We simply do not know the facts on this question.  If we do not know the facts on this question, we cannot logically or accurately say that in reality there was "systematic exclusion" in this case, except in the most abstract, generalized statistical sense.

Third, even if we assume the under representation of black jurors based on the "computer glitch" and the various statistical tests courts have used to measure the representation of distinctive groups in jury pools, the assumption may very well be wrong because one or more of the clerks in the Kent County Circuit Court Clerk's office, on their own initiative, apparently added black members to some of the venires in order to overcome what they perceived to be juries that were too white.  Based on the findings of Michigan courts, we may take judicial notice of the work of the clerks of court to try to make up for the shortfall of black jurors:

> Moreover, there was evidence that the error began in April 2001 and persisted over a period of 16 months.  Terry Holtrop, the case-management manager for the Kent Circuit Court, testified that he became aware in April 2001 that there was a problem of underrepresentation of minorities on Kent County juries.  Gail VanTimmeren, the jury clerk for the Kent Circuit Court, testified that it was "visually evident" that there were not enough minorities coming in for jury duty and that she had spoken to the administrator "over and over again" about this.  VanTimmeren asserted that on a number of occasions, she handpicked individuals who appeared to be African-American to be placed on a panel from which a jury would be selected.  She asserted that "we significantly, in every single week, were not getting minorities in, and something was wrong."

*People v. Bryant*, 796 N.W.2d 135, 143-44 (Mich. App. Ct. 2010).  Thus, we do not know whether any particular jury was unrepresentative of the community.

Fourth, when the jury decides a highly contested case based on the instincts, credibility determinations and inferences of twelve jurors after extensive discussions in the jury room, how can we judge the effect of the failure to have seated, or called for jury duty, a juror from a particular distinctive group?  So long as the evidence supports the verdict and so long as the selection process does not purposely discriminate against members of the group, I am unable to find prejudice or a reasonable basis for setting aside a jury verdict in cases like this one.

A central purpose of the modern trial by jury is to protect the citizen from the executive branch by democratizing the judicial process through a representative group of citizens who apply the often-complicated rules of the criminal law and debate among themselves what justice requires in the case.  See Plucknett, "A Concise History of the Common Law" 136-38 (1956).  Taking into account all of the factors in this case — *e.g.*, the attitude of the Supreme Court about the lack of persuasiveness of abstract statistical arguments, our lack of precise knowledge of

what jurors were in fact impaneled, and the facts of the case and the jury verdict — I cannot say that the jury in this case was not representative of the people of Kent County, and I am not inclined to set aside the verdict and start all over again.  Like my colleague, Judge Rogers, I see no injustice in upholding the jury verdict in the Circuit Court of Kent County in this case.

---

**CONCURRING IN PART AND DISSENTING IN PART**

---

POLSTER, District Judge concurring in part and dissenting in part. I concur with most of Judge Rogers' thorough and thoughtful opinion. While I agree that the decision of the district court should be reversed, I would remand the case to permit the district court to analyze the case using the correct legal standard, and without any reliance upon the expert report of Dr. Sommers.

As Judge Rogers states, the district court erred in applying a less stringent *Hollis* – rather than *Strickland* – prejudice standard to determine whether to excuse Ambrose's procedural default. While in retrospect our language in *Ambrose I* could have been a bit clearer, Judge Rogers' opinion has reaffirmed our holding that the *Strickland* standard applies.

Second, as Judge Rogers states, the district court erred in relying at all on the testimony of Dr. Sommers. In the first instance, as Judge Rogers notes, Dr. Sommers engaged in racial stereotyping. Any reference to, or reliance upon, racial stereotyping is inconsistent with the holding and theory of *Batson v Kentucky*, 476 U.S. 79 (1986). Further, Dr. Sommers' testimony and conclusions are legally irrelevant. The Constitution does not give a criminal defendant the right to any particular racial composition of his/her petit jury, nor does the Constitution give a defendant the right to a jury that might be deemed less likely to convict.

The Constitutional right involved is the right to have a jury selected by a system that does not under-represent any particular racial or ethnic group. There is no Constitutional guarantee that any given jury will contain any particular number of minority members, or that it will reflect the racial or ethnic composition of the District. The Constitutional right is to a system for selecting jury venires that is likely to yield one that will contain a fair cross-section of the District's population, whatever the racial or ethnic distribution might be, and that does not under-represent any particular racial or ethnic group. As a result of a computer software glitch, the system used in Kent County, Michigan under-represented African-Americans in the jury pools during the period April 2001 to early 2002.

Accordingly, I would reverse and remand the case to allow the district court to analyze the evidence against Ambrose under the correct *Strickland* standard, and without any reference to Dr. Sommers' findings.