Dana KENNEDY, Petitioner–Appellant,

v.

Thomas MACKIE, Warden,
Respondent–Appellee.

No. 14–2342.

United States Court of Appeals,
Sixth Circuit.

Jan. 19, 2016.

BEFORE: SILER, GIBBONS, and ROGERS, Circuit Judges.

SILER, Circuit Judge.

In 2006, a Wayne County Circuit Court jury found Dana Kennedy guilty of first-degree murder, assault with intent to murder, felon in possession of a firearm, and possession of a firearm during the commission of a felony. Kennedy appeals the district court's denial of his petition for writ of habeas corpus filed under 28 U.S.C. § 2254. Certificates of Appealability (COA) have been granted on the following issues: (1) the use at trial of an erroneous ballistics report from the Detroit Crime Laboratory; (2) an informant's post-trial recantation of his testimony; (3) denial of Kennedy's Sixth Amendment right to self-representation; and (4) ineffective assistance of appellate counsel. For the reasons explained below, we affirm the district court's denial of Kennedy's petition for writ of habeas corpus.

## FACTUAL AND PROCEDURAL BACKGROUND

In 2005, Roderick Heath was fatally shot at a market in Detroit, Michigan. On the evening of the shooting, D'Andre Hum-

phrey drove by the market and noticed Towana Moton, Byron Royster, and Heath standing nearby. Soon after, Humphrey heard gunshots coming from the right side of his vehicle and saw "Dana Kennedy hanging out the window [of a red Jeep Liberty] with an AK" firing the weapon.

Royster also saw gunshots coming from the Jeep, but he could not see the individual firing the weapon. As Royster ducked and ran away from the gunshots, he heard more than twenty continuous rounds fired.

Moton, who was standing next to Heath at the side of the market, also saw the Jeep coming toward the store and heard gunshots from the passenger side of the vehicle. Heath pushed Moton to the ground. Like Royster, Moton did not see who was firing the weapon from the Jeep.

When the gunshots ended, Moton crawled to Heath, who was dead near the door of the store. Royster asked Humphrey who had killed Heath, and Humphrey responded that "Butch" had killed Heath. Kennedy is also known as Butch.

A month prior, Kennedy's house burned down. Humphrey testified that he heard Kennedy accuse Heath of "burn[ing] up [his] spot." By "spot," Kennedy meant his crack house. The prosecution theorized that Kennedy killed Heath for retribution related to the burning of the house.

After trial, the jury found Kennedy guilty of first-degree murder, assault with intent to murder, felon in possession of a firearm, and possession of a firearm during the commission of a felony ("felony firearm"). Kennedy was sentenced to life for first-degree murder, twenty-five to eighty years for assault with intent to murder, three to five years for being a felon in possession of a firearm, and a two-year consecutive sentence for felony firearm.

Kennedy appealed his conviction to the Michigan Court of Appeals. It affirmed Kennedy's conviction, *People v. Kennedy*, No. 269102, 2007 WL 2118853, at *4 (Mich. Ct.App. July 24, 2007) (per curiam), and the Michigan Supreme Court denied his application for leave to appeal, *People v. Kennedy*, 480 Mich. 958, 741 N.W.2d 376 (2007) (order).

After the Michigan Supreme Court denied Kennedy's appeal, he sought post-conviction relief from the Wayne County Circuit Court. Kennedy previously raised most of the issues on his direct appeal; however, he argued, for the first time, that the trial court erred by denying his Sixth Amendment right to self-representation. The trial court denied Kennedy's motion, finding that Kennedy failed to provide good cause for identifying newly-raised issues like the self-representation claim and had suffered no prejudice, and that Kennedy's remaining issues had already been addressed by the Michigan Court of Appeals. Opinion and Order Denying Defendant's Motion for Relief from Judgment at 2–3, *People v. Kennedy*, No. 05–012004–01 (Wayne Cty.Cir.Ct. July 28, 2008). Thereafter, the Michigan Court of Appeals and the Michigan Supreme Court denied Kennedy's applications for leave to appeal. Order at 1, *People v. Kennedy*, No. 293347 (Mich.Ct.App. Nov. 23, 2009) (order); *People v. Kennedy*, 488 Mich. 869, 788 N.W.2d 418 (2010) (order).

Kennedy filed a habeas petition with the district court, claiming in part that: (1) the prosecutor presented false evidence, (2) Kennedy was denied his Sixth Amendment right to self-representation, (3) Kennedy was denied effective assistance of counsel during his trial, and (4) Kennedy was denied effective assistance of counsel on his direct appeal. Prior to the district court's ruling on the habeas petition, Kennedy successfully moved to stay proceedings in order to exhaust state court remedies related to the Michigan State Police's retest-

ing of the ballistics evidence used in his trial.

Based on the newly discovered ballistics evidence, Kennedy moved to file a post-conviction relief motion with the Wayne County Circuit Court. Successive Motion for Relief from Judgment at 5–6, *People v. Kennedy*, No.2005–012004–01 (Wayne Cty. Cir.Ct. Sept. 27, 2012). In denying Kennedy's motion, the Wayne County Circuit Court found that "even if one or more of [Kennedy's] aforementioned claims of error have merit, they do not change the fact that the new firearms evidence fails to establish a reasonable probability that the outcome of his trial would have been different." Opinion at 2, *People v. Kennedy*, No. 05–012004–01–FC (Wayne Cty.Cir.Ct. Jan. 7, 2013).

In moving to lift the stay in the district court, Kennedy amended his habeas petition, asserting new claims that: (1) his due process rights were violated by the presentation of false ballistics evidence, (2) his due process rights were violated by the state's use of false testimony, (3) his rights to confrontation and to present a complete defense were violated by the state's suppression of evidence and use of false evidence, (4) there was insufficient evidence to convict him of first-degree murder, (5) the prosecutor engaged in misconduct, and (6) he was denied effective trial and appellate counsel. The district court denied Kennedy's habeas petition.

## STANDARD OF REVIEW

"In a habeas corpus appeal, we review the district court's legal conclusions de novo, but will not set aside its factual findings unless they are clearly erroneous." *Ivory v. Jackson*, 509 F.3d 284, 291 (6th Cir.2007) (citing *Dyer v. Bowlen*, 465 F.3d 280, 283–84 (6th Cir.2006)). However, the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub.L. No. 104–132, 110 Stat. 1214, governs our review of Michigan state decisions in this case. *See, e.g., Daoud v. Davis*, 618 F.3d 525, 528 (6th Cir.2010). Under the AEDPA, a habeas petition must be denied unless the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

## ANALYSIS

### A. New Ballistics Evidence

During Kennedy's trial, the state called as a witness a Detroit Crime Laboratory technician who testified that all nineteen cartridge casings found at the corner market came from one weapon. The technician also explained that the two bullets recovered from Heath's body were "caliber compatible" with the nineteen casings recovered from the market. However, he acknowledged at Kennedy's trial, "[o]nce [the bullets are] separated from a casing [he] c[ould not] tell you that [the bullets] were part of those casings at one time." Approximately five years after the trial, in April 2011, the Michigan State Police retested the ballistics from Kennedy's case and found that fourteen bullets were fired from the same weapon but five were not.

Kennedy raises four claims related to the new ballistics evidence discovered during the pendency of his habeas petition in the district court, arguing that: (1) his due process rights were violated through withholding of *Brady* material, (2) his right to confrontation was violated, (3) his right to a complete defense was violated, and (4) he was denied effective assistance of trial and appellate counsel. In response, the War-

den argues that Kennedy's claims all fail for the same reason: the new ballistics evidence did not exist at the time of Kennedy's trial.

## 1. Due Process

Due process prohibits the suppression of evidence by the prosecution if the evidence is "material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). A *Brady* violation occurs if three conditions are met: "[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281–82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999). "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley*, 514 U.S. 419, 434, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995).

■ Even if Kennedy could establish the first two prongs of a *Brady* claim, he fails to establish prejudice, as determined by the Michigan courts. According to Kennedy, his "jury was left with no choice but to believe that one person firing one weapon killed the victim, as claimed in the testimony of Humphrey, Royster, and Moton—the exact theory advanced by the state court prosecutor." We disagree. At most, the Michigan State Police's ballistics report would have undermined witness testimony about hearing continuous gunshots from one gun. This report, however, would not have changed the key testimony at trial. Humphrey, who knew Kennedy prior to the incident, described how he witnessed Kennedy firing a gun out of the passenger window of a Jeep. Further, whether Kennedy fired fourteen or five bullets does not undermine confidence in the jury's verdict. Therefore, Kennedy is not entitled to relief under this claim.

## 2. Presentation of False Evidence

"[A] conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment." *Napue v. Illinois*, 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959) (citation omitted). The Supreme Court "has consistently held that a conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Agurs*, 427 U.S. 97, 103, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976) (footnotes omitted). For Kennedy to succeed on a false-evidence claim, he must demonstrate: "(1) that the prosecution presented false testimony[,] (2) that the prosecution knew was false, and (3) that was material." *Abdus–Samad v. Bell*, 420 F.3d 614, 626 (6th Cir.2005) (citing *United States v. Hawkins*, 969 F.2d 169, 175 (6th Cir.1992)).

■ Kennedy asserts that the prosecution violated his due process rights by presenting false evidence at trial. The district court concluded that Kennedy's claim lacked merit because the prosecution did not know of the Detroit Crime Laboratory's erroneous report during the trial. On appeal, Kennedy remains unable to present evidence to establish the second prong of a false-evidence claim: that the prosecution knew of the evidence's falsity. Therefore, this claim is meritless.

### 3. Rights to Confrontation and to Present a Complete Defense

The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." U.S. Const. amend. VI. "[T]he Clause's ultimate goal is to ensure reliability of evidence, but it is a procedural rather than a substantive guarantee. It commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination." *Crawford v. Washington,* 541 U.S. 36, 61, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). The Sixth Amendment also ensures a defendant the right to present witnesses in his defense. *See Taylor v. Illinois,* 484 U.S. 400, 409, 108 S.Ct. 646, 98 L.Ed.2d 798 (1988); *see also Crane v. Kentucky,* 476 U.S. 683, 690, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986) ("Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.' " (quoting *California v. Trombetta,* 467 U.S. 479, 485, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984) (internal citations omitted))).

■ Kennedy contends that the prosecution's use of false ballistics testimony resulted in his not being able to effectively cross-examine Moton, Royster, and Humphrey in order to discredit their testimony. Here, as noted by the district court, Kennedy makes no claim that he was denied the ability to cross-examine witnesses regarding the ballistics report, only that the evidence was false. The Confrontation Clause, however, "guarantees only 'an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.' " *United States v.*

*Owens,* 484 U.S. 554, 559, 108 S.Ct. 838, 98 L.Ed.2d 951 (1988) (quoting *Kentucky v. Stincer,* 482 U.S. 730, 739, 107 S.Ct. 2658, 96 L.Ed.2d 631 (1987)); *see also United States v. Collins,* 799 F.3d 554, 586 (6th Cir.2015), *cert. denied,* —— U.S. ——, 136 S.Ct. 601, 193 L.Ed.2d 480 (2015). Kennedy was not denied the procedural protections contemplated by the Sixth Amendment and therefore cannot demonstrate violation of the Confrontation Clause.

### 4. Effective Assistance of Counsel

A defendant relying on a claim of ineffective assistance of counsel must make two showings. First, he "must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment. [We] must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland v. Washington,* 466 U.S. 668, 690, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Second, he must demonstrate prejudice, meaning "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104 S.Ct. 2052. "The standards created by *Strickland* and § 2254(d) are both 'highly deferential,' " meaning that when applied together, our "review is 'doubly' so." *Harrington v. Richter,* 562 U.S. 86, 105, 131 S.Ct. 770, 178 L.Ed.2d 624 (2011) (quoting *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052; *Knowles v. Mirzayance,* 556 U.S. 111, 123, 129 S.Ct. 1411, 173 L.Ed.2d 251 (2009)).

■ Kennedy argues that the erroneous ballistics report resulted in both ineffective trial and appellate counsel. He describes the problem with his counsel as follows:

[Counsel] had no readily apparent reason to investigate the ballistic evidence based on representations by the State. He was denied a significant impeachment tool based on representations by the State; and was hindered in presenting the defense of another shooter in light of expert testimony that the ballistic evidence established the use of a single weapon.

Omitted from Kennedy's contention is how his trial attorney's actions fell below the acceptable range of professional competency. Simply put, counsel did not know to investigate the erroneous ballistics report because the Michigan State Police's new report did not exist until five years after the trial. Likewise, Kennedy's appellate counsel cannot be said to be ineffective since the newly discovered evidence was not available until after Kennedy's appeal of right. Therefore, Kennedy cannot establish the first prong of *Strickland.*

## 5. Harmless Error

■ Even if any of the four above claims had merit, Kennedy is not entitled to relief on this issue because any error was harmless. In reviewing a habeas petition, a federal court "must assess the prejudicial impact of constitutional error in a state-court criminal trial under the 'substantial and injurious effect' standard set forth in *Brecht [v. Abrahamson,* 507 U.S. 619, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993) ]." *Fry v. Pliler,* 551 U.S. 112, 121, 127 S.Ct. 2321, 168 L.Ed.2d 16 (2007). Under *Brecht,* "we ask whether the error 'had substantial and injurious effect or influence in determining the jury's verdict.'" *Hereford v. Warren,* 536 F.3d 523, 533 (6th Cir.2008) (quoting *Brecht,* 507 U.S. at 623, 113 S.Ct. 1710). "When a federal judge in a habeas proceeding is in grave doubt about whether a trial error of federal law had 'substantial and injurious effect or influence in determining the jury's verdict,'

that error is not harmless." *O'Neal v. McAninch,* 513 U.S. 432, 436, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995).

On the question of harmless error, the district court concluded that "the admission of the erroneous ballistics evidence at trial did not have a substantial and injurious effect or influence in determining the jury's verdict." We agree with the district court. For the purposes of proving intent, it is unlikely that the jury would have been convinced that Kennedy had less intent to kill Heath had it been shown that he fired five instead of fourteen bullets. As the district court noted, "[t]here is little practical difference between shooting at someone with an AK–47 from a car five times or nineteen times. Either way, the inference that the shooter intended to kill his target is a strong one." Furthermore, the ballistics report would not have changed Humphrey's testimony that he witnessed Kennedy in the Jeep firing an AK–47. Therefore, the use of the erroneous ballistics report resulted in harmless error, if any error at all, and habeas relief is not warranted.

## B.  Jailhouse Informant

Kim Harvey, who was being held at the Wayne County Jail at the same time as Kennedy, testified that he spoke to Kennedy about Kennedy's case. They had approximately fifteen to twenty-five conversations. Harvey contended that during one of those conversations, Kennedy divulged to him that Kennedy had murdered Heath and what precipitated their conflict. Harvey also testified that Kennedy sent him a letter threatening Harvey not to testify and to "just plead the 5th or say they're trying to coerce you into saying some[thing]." Finally, when asked at trial whether he received a deal from the prosecutor in exchange for his testimony, Harvey denied having one.

Harvey later recanted his testimony. The recanting affidavits submitted by Harvey indicated that he not only fabricated his story about Kennedy's confession but also lied about not receiving a deal from the prosecutor in exchange for his testimony. In fact, Harvey claimed that "[his] lawyer put it on the record for the judge ... to know about the agreement [the prosecutor] an[d] I made."

Kennedy filed an appeal with the Michigan Court of Appeals, claiming a *Brady* violation based on Harvey's perjured testimony and the deal Harvey alleged to have received in exchange for his testimony. *Kennedy,* 2007 WL 2118853, at *2. In discussing the merits of Kennedy's claim, the Michigan Court of Appeals observed that "the jailhouse informant's testimony was not the only evidence supporting the conviction. Rather, another eyewitness testified that he observed the shooting, saw [Kennedy] clearly, and that he was certain that [Kennedy] was the shooter." *Id.* Based on those grounds, the court concluded that "[e]ven if [Kennedy] can satisfy the first three prongs of the *Brady* test, however, he has not shown a reasonable probability that the outcome of his trial would have been different had this alleged evidence been disclosed." *Id.*

■ The central question, as posed by Kennedy, is whether the Michigan Court of Appeals incorrectly applied federal law to its *Brady* analysis. Specifically, Kennedy asserts that the Michigan Court of Appeals incorrectly required him to demonstrate that " '*the outcome of the trial would have been different*'—a holding that conflicts with *Kyles v. Whitley* ... which states the question 'is not whether the defendant would more likely than not have received a different verdict.' " True, "[a] showing of prejudice need not mean that the evidence would have led to an acquittal, but merely 'a reasonable probability

that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.' " *Montgomery v. Bobby,* 654 F.3d 668, 687 (6th Cir.2011) (quoting *Kyles,* 514 U.S. at 433–34, 115 S.Ct. 1555). However, the standard applied by the Michigan Court of Appeals does not depart from what is required by *Kyles.*

■ As to Harvey's recanting affidavits, Kennedy suggests that "[t]here is nothing inherently unreliable about" them. But recantation of trial testimony is viewed cautiously even if done by an affidavit. *See, e.g., Welsh v. Lafler,* 444 Fed.Appx. 844, 850 (6th Cir.2011). "This Circuit has previously held that '[e]ven if accepted, a post-trial recantation is generally not sufficient to grant habeas relief absent constitutional error.' " *Id.* (quoting *Bower v. Curtis,* 118 Fed.Appx. 901, 908 (6th Cir. 2004)). However, if a deal existed between Harvey and the prosecution, *Brady* would mandate that it be disclosed to Kennedy. *See Bell v. Bell,* 512 F.3d 223, 232 (6th Cir.2008) ("It is well established that an express agreement between the prosecution and a witness is possible impeachment material that must be turned over under *Brady.*" (citation omitted)). *Brady* applies to even "a less formal, unwritten or tacit agreement." *Id.* at 233 (citation omitted). But there must be proof to establish the existence of an unwritten agreement. *Id.*

Only two pieces of evidence suggest a tacit agreement: Harvey's testimony at trial that he hoped to get a deal and his recanting affidavits. But a jailhouse informant's unilateral desire for "favorable treatment in return for his testimony is insufficient; there must be some assurance or promise from the prosecution that gives rise to a *mutual* understanding or tacit agreement." *Akrawi v. Booker,* 572 F.3d 252, 263 (6th Cir.2009) (citing *Bell,* 512 F.3d at 233). Here, except for Harvey's

recanting affidavits, there is no proof in the record suggesting the existence of an agreement.

Even if an agreement between the prosecutor and Harvey existed, it would likely have only marginally discredited Harvey's already suspect testimony. Not only did Harvey admit that he wrote to the prosecutor seeking a deal, but he also told the jury that he was under the belief that the charges against him would be dropped if he testified against Kennedy. Further diminishing Harvey's credibility was the jurors' knowledge that he was in jail and that he had pleaded guilty to armed robbery. Considering the impeachment evidence raised by Kennedy's defense counsel at trial, cross-examining Harvey about an agreement would only have marginally assisted in discrediting him further. *See Akrawi*, 572 F.3d at 264 (finding that defense counsel's cross-examination might have been *"more* effective if evidence of the mutual understanding had been disclosed prior to trial, but only incrementally so"). Of course, the existence of an agreement between Harvey and the prosecutor would not have impacted Humphrey's eyewitness testimony.

Whatever impact Harvey's allegedly false testimony had on the jury, its nondisclosure did not create a reasonable probability that the outcome of the proceeding would have been different. Therefore, no *Brady* violation occurred and the Michigan Court of Appeals' ruling was not an unreasonable application of clearly established federal law.

## C. Right to Self–Representation

On the morning of voir dire, Kennedy informed the trial court that he was concerned that his attorney had not communicated with him about a certain evidentiary ruling. After the trial court indicated that Kennedy should raise this issue at a later time, Kennedy responded, "Well, at this time, your Honor, I would like to exercise my 6th Amendment right and I'd rather go pro per." The trial court told Kennedy that it would not allow him to represent himself because it would not be in Kennedy's "best interest" and that Kennedy had "an excellent attorney." A short colloquy then ensued in which the trial court reiterated its position and Kennedy expressed his distrust of his attorney and the trial court.

On the day after jury selection, the trial court revisited Kennedy's request to represent himself. The trial court explained that it did not believe that Kennedy had been unequivocal in his desire to represent himself on the previous day, but the court asked Kennedy how he wished to proceed: either pro se or with his present attorney. Kennedy stated that he did not want to represent himself if he could not get a continuance. After the trial court told Kennedy that it would not grant a continuance and elaborated on why it did not believe Kennedy should represent himself, Kennedy relented, stating several times that he wished to start the trial. When the prosecutor sought to clarify for the record that she believed Kennedy had withdrawn his request to represent himself, Kennedy did not object.

The Warden contends that the merits of Kennedy's Sixth Amendment right to self-representation claim need not be reached because he procedurally defaulted this claim. Kennedy argues that he received ineffective assistance of appellate counsel and thus has cause to excuse his procedural default. The district court did not address the argument concerning procedural error, determining instead that Kennedy was initially ambiguous in his desire to represent himself, and ultimately withdrew his request.

In order to respect the finality of state-court decisions and preserve the principles of federalism, federal courts follow the doctrine of procedural default. *See Martinez v. Ryan*, —— U.S. ——, 132 S.Ct. 1309, 1316, 182 L.Ed.2d 272 (2012). This doctrine instructs that habeas review does not generally extend to the merits of claims, even constitutional ones, if the state court denied the prisoner's claim for failing to follow the state's procedural rules. *See id.* Procedural default occurs when:

> (1) the petitioner fails to comply with a state procedural rule; (2) the state courts enforce the rule; (3) the state procedural rule is an adequate and independent state ground for denying review of a federal constitutional claim; and (4) the petitioner cannot show cause and prejudice excusing the default.

*Guilmette v. Howes*, 624 F.3d 286, 290 (6th Cir.2010) (en banc) (quoting *Tolliver v. Sheets*, 594 F.3d 900, 928 n. 11 (6th Cir. 2010)).

Kennedy did not raise his Sixth Amendment right to self-representation claim in his direct appeal. *See Kennedy*, 2007 WL 2118853, at *1–3. Rather, the first time Kennedy asserted this argument was in his motion for post-conviction relief filed with the Wayne County Circuit Court, which denied the motion based on Michigan Court Rule 6.508(D)(3).

Default under Michigan Court Rule 6.508(D)(3) normally constitutes an independent and adequate state ground barring habeas review, *see Jones v. Bell*, 801 F.3d 556, 561 (6th Cir.2015), if expressly stated by the court, *Henderson v. Palmer*, 730 F.3d 554, 561 (6th Cir.2013) ("[For Michigan Court Rule 6.508(D) ] [t]o operate as a bar to habeas review, such a rule *must be clearly and expressly invoked.*" (citation omitted)). However, procedural default can be excused by a showing of "cause for the default," *House v. Bell*, 547 U.S. 518, 536, 126 S.Ct. 2064, 165 L.Ed.2d 1 (2006) (citations omitted), and "actual prejudice," *Ambrose v. Booker*, 684 F.3d 638, 649 (6th Cir.2012).

As "cause" justifying default, Kennedy relies on his claim for ineffective assistance of appellate counsel (IAAC). For IAAC to excuse default, it must "meet[] *Strickland's* ineffectiveness standard." *Jones*, 801 F.3d at 562 (citing *Byrd v. Collins*, 209 F.3d 486, 519 (6th Cir.2000)). This standard requires that Kennedy demonstrate: (1) that his appellate "counsel's performance was deficient" and (2) that "the deficient performance prejudiced the defense . . . as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687, 104 S.Ct. 2052. We only reach the question of "actual prejudice" if Kennedy meets the "high burden" imposed by *Strickland*. *Jones*, 801 F.3d at 562.

Our decision in *Jones* is instructive for the *Strickland* and actual prejudice questions presented here. Jones sought to proceed pro se on the first day of trial, claiming that his attorney was not prepared. *Id.* at 560. The trial court denied Jones's request with little explanation other than that the judge did not believe Jones could handle self-representation. *Id.* Like Kennedy, Jones failed to raise his Sixth Amendment claim on direct appeal but argued that IAAC excused the procedural default. *Id.* at 560–61.

When considering *Strickland*'s "deficient performance" prong in *Jones*, we noted that "Michigan recognizes that day-of-trial requests may be validly rejected as untimely because they disrupt the administration of justice." *Id.* at 562 (citing *People v. Hill*, 485 Mich. 912, 773 N.W.2d 257, 257 (2009); *People v. Russell*, 471 Mich. 182, 684 N.W.2d 745, 757 (2004)). In *Jones*, we declined to make a finding on

the "deficient performance" prong, noting that it was a close call. *Id.* at 563. As for the second *Strickland* prong, we explained that presuming the defendant can establish deficient performance, *Strickland* prejudice would be satisfied since prevailing on the appeal would have resulted in a new trial for Jones. *Id.* ("The Supreme Court has held that 'denial [of the right to self-representation] is not amenable to "harmless error" analysis'; it is structural error." (alteration in original) (quoting *McKaskle v. Wiggins,* 465 U.S. 168, 177 n. 8, 104 S.Ct. 944, 79 L.Ed.2d 122 (1984))). However, there was no evidence in the record to demonstrate "actual prejudice" even if Jones could establish *Strickland*'s two-pronged test. *Id.* at 564. The reason is that unlike *Strickland* prejudice, "actual prejudice" requires a defendant to show that " 'the outcome would have been different' 'regardless of the nature of the underlying constitutional claim.' " *Id.* (quoting *Ambrose,* 684 F.3d at 650–51). In other words, the fact that the trial court's denial of a defendant's right to self-representation constitutes a structural error and thus creates an automatic right to a new trial, *see McKaskle,* 465 U.S. at 177 n. 8, 104 S.Ct. 944, does not mean that the *"actual* and *eventual* outcome of the *trial"* would be different. *Jones,* 801 F.3d at 564 (citing *Ambrose,* 684 F.3d at 650–51).

■ Kennedy makes no showing that his trial would have resulted in a different outcome if he had proceeded pro se. Rather, the record suggests that Kennedy would have fared much worse had he chosen to defend himself, as evidenced by Kennedy's own admission on the second day of trial: "Going pro per. I'm not ready to go to trial." There is no basis to believe that Kennedy, who admitted to not being prepared, would have defended himself better than his attorney. *Cf. Jones,* 801 F.3d at 564 ("Neither Jones nor the

district court attempted to show that the outcome *at trial* would have been different had Jones represented himself. Nor is there any indication in the record that it would have been."). Accordingly, Kennedy, like Jones, cannot establish actual prejudice and therefore his Sixth Amendment claim fails.

### D. Ineffective Assistance of Appellate Counsel

To succeed on a claim of IAAC, Kennedy has the burden of meeting the *Strickland* test by demonstrating both deficient performance of counsel and prejudice. *Evans v. Hudson,* 575 F.3d 560, 564 (6th Cir.2009) ("Claims of ineffective assistance of appellate counsel are subject to the *Strickland* test, which requires a defendant to show both deficient representation and prejudice." (citation omitted)). Effective assistance of appellate counsel does not require raising every nonfrivolous argument on appeal. *Jones v. Barnes,* 463 U.S. 745, 751–52, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983).

■ Although Kennedy argues that he preserved his self-representation claim by raising it prior to trial and thereby requiring counsel to challenge it on appeal, his argument fails. Kennedy waited until the first day of trial to make his request and later withdrew his request on the second day of trial. Therefore, appellate counsel could have determined that Kennedy abandoned or failed to adequately raise his request in a timely manner and could have decided, as part of "sound trial strategy," not to raise the right to self-representation claim on appeal. *See Brown v. Burt,* 65 Fed.Appx. 939, 942 (6th Cir.2003) ("Appellant must overcome the presumption that his counsel's action might be considered 'sound trial strategy.' " (citing *Strickland,* 466 U.S. at 688–94, 104 S.Ct. 2052)).

For those reasons, Kennedy fails to demonstrate the first prong under *Strickland.*

### CONCLUSION

In sum, the state's use of erroneous ballistics evidence at trial did not violate Kennedy's rights to due process, confrontation, present a complete defense, or effective assistance of counsel. Additionally, the Michigan Court of Appeals' ruling that no *Brady* violation resulted from the jailhouse informant's false testimony was not an unreasonable application of clearly established federal law, as it would have done little to discredit the informant's already suspect testimony and it would not have impacted the key eyewitness's testimony. Lastly, Kennedy procedurally defaulted his Sixth Amendment right to self-representation claim and cannot meet his burden of showing ineffective assistance of appellate counsel.

**AFFIRMED.**